1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

9

SHANNON BROPHY et al.,                        )
                                              )
10                    Plaintiffs,             )
                                              )
11        vs.                                 )        3:10-cv-00035-RCJ-RAM
                                              )
12   DAY & ZIMMERMAN HAWTHORNE CORP.          )        **ORDER**
     et al.,                                  )
13                                            )
                      Defendants.             )
14   _____)

15

16        This case arises out of an alleged racially and sexually hostile work environment,

17   pregnancy discrimination, unlawful retaliation, and an employer's failure properly to train and

18   supervise its employees to avoid such abuses.  Pending before the Court are Defendant Day &

19   Zimmermann Hawthorne Corp.'s ("DZHC") Motions for Summary Judgment as to Plaintiffs

20   Shannon Brophy (ECF No. 26), Khristina Armstead (ECF No. 27), and Michael Lightfoot (ECF

21   No. 28).  DZHC has also filed a Motion for Leave to File Excess Pages (ECF No. 37).  For the

22   reasons given herein, the Court grants the motions for summary judgment in part and grants the

23   motion for leave to file excess pages.

     **I.       FACTS AND PROCEDURAL HISTORY**

24

25        Plaintiffs worked as firefighters for DZHC and Defendant SOC Nevada LLC. (First Am.

Compl. 7–8, Aug. 6, 2010, ECF No. 21).  Brophy and Armstead are Caucasian women, and

Lightfoot is a Caucasian man.  Armstead has bi-racial children.  Plaintiffs allege they were

subjected to a pervasively race- and gender-based hostile work environment.

For example, Assistant Fire Chief Doug Homestead made it clear that he did not like

women in the fire service. (*Id.* 9).  He did not think they should drive the fire truck, and he did

not want them in his platoon. (*Id.* 10).  Homestead routinely treated Brophy and Armstead

differently from the male employees. (*Id.* 11).  For example, while men routinely used the

restroom two or more at a time, Homestead prohibited Brophy and Armstead from using the

women's restroom together because "two women in the restroom together looked like a couple

of lesbians." (*Id.*).  Homestead also routinely accused Brophy and Lightfoot (Brophy's captain)

of having an affair and blamed the station's clogged sewers on the couple's discarded condoms.

(*Id.* 12).  Homestead allegedly stated that women are "cunts" and are only good for "blow jobs,"

a reference to oral sex. (*Id.* 13).  Homestead stated that women were useless, and no woman was

worthy of receiving the title of "firefighter of the quarter." (*Id.*).  Defendants allowed

"magazines of nude women" in the workplace and kept a clock on the wall of a "partially nude

woman" with the knowledge and acquiescence of Homestead. (*Id.* 14).  Homestead made

repeated, hostile remarks toward Armstead (who is the mother of six bi-racial children) relating

to sex with African-American men. (*Id.* 15).  Homestead made the comments in the presence of

Plaintiffs, all of whom are white. (*Id.*; Mot. Summ. J. 3, Nov. 15, 2010, ECF No. 26).

Homestead also commented on the weight of female firefighters whereas male firefighters were

not subject to this treatment. (First Am. Compl. 15).  Furthermore, during their time in

Defendants' employ, both Brophy and Armstead became pregnant and were denied

accommodations due to their pregnancies. (*Id.* 18).

In Spring 2008, all three Plaintiffs filed charges with the Nevada Equal Rights

Commission ("NERC") requesting simultaneous filing with the U.S. Equal Employment

Opportunity Commission ("EEOC"). (*See* Brophy Charge of Discrimination ("COD"), Apr. 15, 2008, ECF No. 26-24; Armstead COD, Apr. 15, 2008, ECF No. 27-22; Lightfoot COD, May 2, 2008, ECF No. 34-9, at 3).  The EEOC issued Plaintiffs right-to-sue letters ("RTS") in Fall 2009. (*See* Brophy RTS, Oct. 22, 2009, ECF No. 26-25; Armstead RTS, Oct. 23, 2009, ECF No. 27-24; Lightfoot RTS, Oct. 23, 2009, ECF No. 28-15).

Plaintiffs sued Defendants in this Court eighty-nine and ninety days later, respectively. (*See* Compl., Jan. 19, 2010, ECF No. 1).  The FAC lists five causes of action: (1) Gender Discrimination – Hostile Work Environment; (2) Racial Discrimination – Hostile Work Environment; (3) Pregnancy Discrimination; (4) Retaliation; and (5) Negligent Supervision and Training.  In separate motions, DZHC has moved for summary judgment against all three Plaintiffs.  DZHC has also filed an unopposed motion for leave to file a twenty-eight-page reply against Brophy's response.

## II.   SUMMARY JUDGMENT STANDARD

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  In determining summary judgment, a court uses a burden-shifting scheme:

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)

(citations and internal quotation marks omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

     If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

     At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial.  *See Anderson*, 477 U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50. ///

1  **III.    ANALYSIS**

2        **A.    Jurisdiction and Exhaustion**

3        Although filing a charge of discrimination with the EEOC is a jurisdictional prerequisite

4  to a Title VII suit, "filing a *timely* charge of discrimination with the EEOC is not a jurisdictional

5  prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject

6  to waiver, estoppel, and equitable tolling." *Zipes v. TWA*, 455 U.S. 385, 393 (1982) (emphasis

7  added).  The distinction is often of no practical significance, and courts sometimes still refer to

8  the timeliness requirement as being jurisdictional. *See, e.g.*, *Vasquez v. Cnty. of L.A.*, 349 F.3d

9  634, 644 (9th Cir. 2003) ("To establish subject matter jurisdiction over his Title VII retaliation

10  claim, [the plaintiff] must have exhausted his administrative remedies by filing a *timely* charge

11  with the EEOC." (emphasis added)).  But only the requirement to file a charge with the EEOC at

12  some point in time is a jurisdictional prerequisite; the timeliness provision operates as a statute

13  of limitations that may be waived, estopped, or equitably tolled, because it appears in a separate

14  provision of Title VII than does the jurisdictional grant. *Zipes*, 455 U.S. at 393–94; *Surrell v.*

15  *Cal. Water Serv. Co.*, 518 F.3d 1097, 1104–05 (9th Cir. 2008) (citing *id.*).  Title VII's exhaustion

16  requirement limits the jurisdiction of federal courts to those claims that the EEOC has had an

17  opportunity to examine, meaning those claims the EEOC actually adjudicates and any claims the

18  plaintiff files with the EEOC but the EEOC fails to adjudicate or investigate. *Vasquez*, 349 F.3d

19  at 644.  In summary, there is federal jurisdiction over any Title VII claim a plaintiff has given the

20  EEOC an opportunity to adjudicate, but a federal court should accept jurisdiction over, and then

21  dismiss for failure to exhaust administrative remedies, any claim untimely presented to the

22  EEOC, subject to waiver, estoppel, and equitable tolling.

23        A federal court may not consider incidents which are not included in the original EEOC

24  charge unless they are "like or reasonably related to the allegations contained in the EEOC

25  charge." *Green v. L.A. Cnty. Superintendent of Sch.*, 883 F.2d 1472, 1475–76 (9th Cir. 1989).  In

order to determine the scope of it jurisdiction over a Title VII claim, "the court inquires whether the original EEOC investigation would have encompassed the additional charges." *Id.* at 1476. Because Title VII is remedial, and individuals whom Title VII is designed to protect generally have little or no legal training, "charges filed before the EEOC" should be "construed liberally." *Id.*

Brophy filed her COD with NERC on April 15, 2008 and checked the boxes for sex and retaliation but not for race, although her complaint mentioned racially motivated remarks directed toward Armstead.  Brophy alleged that when Armstead was absent due to illness, Homestead asked Brophy "who's [sic] Black Dick is she out sucking today?"  Brophy also alleged that "Respondent" referred to Armstead as a "Nigg-r lover [sic]."  Construed liberally, the Court may conclude that Brophy's reported incidents of racial discrimination are "like or related to the allegations contained in the EEOC charge."  The EEOC issued Brophy her RTS on October 22, 2009.  Armstead filed a charge of discrimination with NERC on the same day as Brophy and checked the boxes for race, color, and sex but not retaliation.  Lightfoot filed his COD with NERC on May 2, 2008 and checked the box for sex but not for race, color, or retaliation.  Lightfoot argues that a "sticky note" on his form requested that the retaliation box be checked.  But this sticky note appears to have been on an earlier version of the COD that Lightfoot did not sign, and in any case, the "sticky note" appears to point towards the "race" box rather than the "retaliation" box.  The COD Lightfoot signed has only the "sex" box checked.  It therefore appears that there is no jurisdiction over Lightfoot's race or retaliation claims, and the Court grants summary judgment to Defendants on those claims.

**B.    The Merits**

**1.    Hostile Work Environment**

In order to prevail on a Title VII hostile work environment claim, whether for gender or race, a plaintiff must show: (1) he was subjected to verbal or physical conduct of a sexual nature

or because of race; (2) this conduct was unwelcome; and (3) this conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003); *Little v. Windemere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2001). "To prevail on a hostile work environment [racial or] sexual harassment claim, the plaintiff must show that her work environment was both subjectively and objectively hostile; that is, she must show that she perceived her work environment to be hostile, and that a reasonable person in her position would perceive it to be so." *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1034 (9th Cir. 2005).

### a.     Standing

First, DZHC challenges whether Brophy and Armstead have standing to bring a hostile work environment claim as to race. Brophy and Armstead's claims as to race, as discussed below, are based on racial epithets against African-Americans (and in particular, remarks directed at Armstead regarding her bi-racial children), but both of these Plaintiffs are Caucasian. In order to have standing, a plaintiff must be "a person claiming to be aggrieved." *Waters v. Hublein, Inc.*, 547 F.2d 466, 469 (9th Cir. 1976). In the context of housing discrimination under Title VIII, the U.S. Supreme Court has held that the term "person aggrieved" includes persons who are not themselves the objects of discrimination, but who are injured "[by] the loss of important benefits from interracial associations." *Id.* (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209–10 (1972)) (alteration in original). The Ninth Circuit has held that this reasoning also applies to Title VII claims. *See Waters*, 547 F.2d at 469.

Brophy and Armstead may have standing to bring a hostile work environment action based on race for remarks directed toward African-Americans, but only if a result of those remarks was the inability to associate with persons of other races. *See id.*; *Clayton v. White Hall Sch. Dist.*, 875 F.2d 676, 679–80 (8th Cir. 1989). Only Armstead makes sufficient allegations. Neither alleges that any African-American person was constructively discharged, wrongfully

1  rejected as an applicant, or otherwise segregated from them at DZHC such that they were denied

2  the benefit of associating with such persons.  They allege only that they were offended by

3  Homestead's and others' racist comments.  As bad as those alleged comments were, as

4  Caucasians, Brophy and Armstead cannot have suffered cognizable harm from these comments

5  under Title VII unless the comments resulted in an inability to associate with members of the

6  class at whom the comments were directed.  Brophy makes no such allegations, but Armstead

7  does.  At oral argument it became clear that firefighters at DZHC sometimes bring their children

8  to work, and it is likely that Armstead avoided bringing her bi-racial children to work because of

9  the racially hostile environment, depriving her of this measure of association with them.  The

10  Court therefore finds that Armstead, but not Brophy, has standing to bring a racially hostile work

11  environment claim based on this harm.

### b.  Sufficiently Hostile or Abusive Environment

13  DZHC next argues that the conduct did not rise to the level of a hostile or abusive

14  environment.  Whether an environment is "hostile" or "abusive" can be determined only by

15  looking at the totality of the circumstances, including the frequency of the discriminatory

16  conduct, its severity, whether it is physically threatening or humiliating or a mere offensive

17  utterance, and whether it unreasonably interferes with an employee's work performance.  *Harris*

18  *v. Forklift Sys.*, 510 U.S. 17, 23 (1993).  Any relevant factor may be taken into account, and no

19  single factor is dispositive.  *Id.*

20  DZHC argues that Brophy points to at most five incidents of gender-based hostility over

21  a two-year period and that Brophy did not find any of the gender- or race-based incidents to be

22  physically threatening or to affect her job performance.  DZHC also argues that the incidents

23  Armstead complains of are few in number, not physically threatening, and did not affect her job

24  performance.  DZHC argues that Lightfoot's claims of a hostile work environment based on

25  gender fail for the same reasons.

While the parties dispute the pervasiveness of the conduct, there is no genuine issue of fact with respect to the lack of physical threats or impact on job performance.  Plaintiffs complain only of verbal remarks, offensive magazines, and other aspects of the physical environment; Plaintiffs did not feel physically threatened, though they felt their job performance was negatively impacted. (*Se*e Brophy Dep., May 12, 2010, ECF No. 26-6, at 59, 64, 68, 70, 74; Armstead Dep., May 13, 2010, ECF No. 27-6, at 58–65, 82–83; Lightfoot Dep., May 21, 2010, ECF No. 28-5, at 50–51).  However, during the relevant period, Plaintiffs performed in an excellent manner and were not subject to disciplinary actions. (Brophy Dep., ECF No. 26-6, at 22, 36–37; Armstead Dep., ECF No. 27-6, at 26, 31–32; Lightfoot Dep., ECF No. 27-9, at 5–6; *id.*, ECF No. 28-5, at 23).  The Court concludes that there is a genuine issue of material fact whether the work environment was sufficiently hostile and abusive to make out a hostile work environment claim.

### c.      Hostile Work Environment – Gender

Plaintiffs allege several examples of a hostile and abusive environment with respect to gender.  On January 22, 2007, Assistant Chiefs Dee Lawrence and Douglas Homestead made platoon changes stating that two women (Brophy and Armstead) serving on the same platoon would make for a very weak platoon.  Homestead reportedly said that one woman was bad enough, but two women would be worse. (Brophy's Verified Answers to Interrog. 3–4, May 6, 2010, ECF No. 26-9; Armstead's Verified Answers to Interrog. 3–4, May 6, 2010, ECF No. 27-8).  On May 22, 2007, Homestead became aware that Brophy and Armstead were in the bathroom at the same time.  He ordered them not to be in the bathroom at the same time because most female firefighters are "lesbians" and that's how it would be perceived. (Brophy's Verified Answers to Interrog. 4; Armstead's Verified Answers to Interrog. 4).  On July 5, 2007, Captain Rich Irwin assigned Brophy and Armstead to different areas while patrolling a fireworks exhibit, because he would not let two women be in the same location. (Armstead's Verified Answers to

Interrog. 3).  In August 2007, Brophy was doing a building inspection with Captain Rich Irvin who reportedly said "women do not belong in the fire service and have no right to be here." (Brophy Dep., ECF No. 26-6, at 63–64; Brophy's Verified Answers to Interrog. 4).  On March 2, 2008, firefighter Jorge (George) Jensen said women should not be allowed to drive fire apparatus or have a license "because they are dumb and put their makeup on while driving." (Brophy Dep., ECF No. 26-6, at 71–74; Brophy's Verified Answers to Interrog. 4).  While handing out a "firefighter of the quarter" award to a male firefighter, Homestead said no woman had ever received the award, that women are not worthy of an award, and that "most are totally useless." (Brophy Dep., ECF No. 26-6, at 66–67; Brophy's Verified Answers to Interrog. 4).  During a hazardous materials training class, Armstead was treated rudely when asking a question while the instructor answered a male firefighter in a "calm manner" when asking the same question a few minutes later. (Armstead's Verified Answers to Interrog. 4).  On numerous occasions, firefighters and supervisors made derogatory comments regarding women including: (1) "no woman of his would ever work in a man's profession"; (2) women cannot and should not be allowed to drive the fire apparatus; (3) women are not good for the fire service and are not competent like men; (4) Assistant Chief Lawrence told others that he was going to show Armstead "what white meat tasted like"; and (5) women can't compete with the men in the fire service because they don't do as good a job. (Armstead's Verified Answers to Interrog. 4–5; Armstead Dep., ECF No. 27-6, at 66, 68–69, 71–72, 74).

Brophy and Armstead have adduced sufficient evidence of pervasive gender-based harassment to support a Title VII claim.  The Court therefore denies summary judgment as to Brophy on the basis of a sexually hostile work environment.  There is a question of material fact whether Brophy quit due to the pervasive harassment (constructive discharge).  However, the Court grants summary judgment as to Armstead, because it became clear at oral argument that she left her employment due to an unrelated injury and subsequent inability to return to work.

Lightfoot's gender-based claims center around being repeatedly accused and questioned regarding a "supposed relationship" with a female co-worker. (*See* Lightfoot's Verified Answers to Interrog. 3, May 6, 2010, ECF No. 28-2 at 3).  However, Lightfoot was not questioned about his relationships with male co-workers, even though he spent more off-duty time with male co-workers than with female co-workers. (*Id.*).  He further alleges he was threatened with discipline if "the appropriate response was not given to the asked question." (*Id.*).  But Lightfoot does not allege and cannot show that he received this treatment because he was a male.  Rather, his treatment was pursuant to a gender-neutral DZHC policy regarding relationships at work between supervisors and employees with the specific goal of preventing sexual harassment issues. (*See* Day & Zimmerman Corporate Policies & Procedures 2–3, May 1, 2002, ECF No. at 28-8).  Under the policy, an officer, director, manager, or supervisor who is romantically involved with an employee is required to report the relationship to the vice-president of human resources. (*Id.*).  Failure to report the relationship may be deemed a violation of the company's sexual harassment policy and is subject to discipline up to and including termination. (*Id.*)  Lightfoot's treatment was due to his status as a supervisor and not as a male.  There is no evidence he was treated differently based on sex.  The Court therefore grants summary judgment against Lightfoot on the basis of a sexually hostile work environment.

### d.    Hostile Work Environment - Race

Plaintiffs Brophy and Armstead allege several examples of a hostile and abusive environment with respect to race.  In June 2007, Doug Homestead called Brophy into his office and asked her "Where is that nigger loving friend of yours today [referring to Armstead]?  Whose black cock is she out sucking, because she called in sick[?]" (Brophy's Verified Answers to Interrog. 6; Armstead's Verified Answers to Interrog. 5–6).  Throughout the entire time of Brophy's employment at the DZHC Fire Department, the word "nigger" was in pervasive use. (Brophy's Verified Answers to Interrog. 6).  Moreover, Brophy was told she would be branded

1  as a "nigger lover" if she continued to be Armstead's friend. (*Id.*).  Brophy does not appear to

2  allege she stopped being Armstead's friend as a result.  After Brophy and Armstead complained

3  about the racial attitude within the department, the assistant chief and one of the firefighters said

4  they were going to change the word "nigger" to "Mondays" because "nobody liked Mondays

5  either." (*Id.*; Armstead's Verified Answers to Interrog. 6).  This same firefighter reported an

6  incident at his home when a "black chick" walked by and he shouted "I hate Mondays!" (a

7  reference to the word change). (Armstead's Verified Answers to Interrog. 6).  This same

8  firefighter also told Armstead that it would take more than one shower to get all the grease off

9  one of her bi-racial children because black people use so much grease and oil products. (*Id.*).

10  Armstead also reports being at the fire station when several firefighters were watching a football

11  game. (*Id.*).  As an African-American player was running with the ball, a firefighter remarked

12  that the ball was a watermelon and the player was trying to save it. (*Id.*).  Armstead was also

13  informed that Homestead would refer to her as a "nigger lover" and that Assistant Chief Dee

14  Lawrence informed others that he would show Armstead "what white meat tasted like." (*Id.* 7).

15  There is sufficient evidence for Brophy and Armstead's claims as to a racially hostile work

16  environment.  However, as discussed, *supra*, only Armstead has standing to bring this claim

17  because of the loss of association with her bi-racial children.  Brophy's only potential loss of

18  association was with Armstead, who is herself Caucasian, and with whom she did not stop

19  associating.

20      **e.    The Ellerth-Faragher Defense**

21      DZHC asserts that the Ellerth-Faragher defense applies to Plaintiffs' claims for a hostile

22  work environment.  Under this defense, DZHC may avoid liability if: (1) it exercised reasonable

23  care to prevent and correct promptly any discriminatory behavior; and (2) the plaintiff

24  unreasonably failed to take advantage of any preventive or corrective opportunities provided by

25  the employer or to otherwise avoid them. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765

1    (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  Proof that an employee

2    failed to use the complaint procedure provided by the employer is normally sufficient to satisfy

3    employer's burden under the second element, although this may also be shown through other

4    means. *Faragher*, 524 U.S. at 807–08.  No affirmative defense is available, however, when the

5    supervisor's harassment culminates in a tangible employment action, such as discharge,

6    demotion, or undesirable reassignment. *Faragher*, 524 U.S. at 808.  The legal standard for

7    evaluating DZHC's efforts to prevent and correct harassment is "whether the employer's actions

8    as a whole established a reasonable mechanism for prevention and correction." *Holly D. v. Cal.*

9    *Inst. of Tech.*, 339 F.3d 1158, 1177 (9th Cir. 2003).

10          DZHC acknowledges that Brophy and Armstead may have a possible constructive

11    discharge claim but argues that the claims fail because Brophy did not resign due to any racial or

12    gender harassment and Armstead did not resign but was terminated after an extended medical

13    leave.  Neither Brophy nor Armstead argue against this defense in their oppositions.

14          Here, DZHC had a mechanism whereby problems could be reported to the employee's

15    manager or supervisor, to the corporate human resources department, or in unique or unusual

16    circumstances, to an employee advocate. (Day & Zimmerman Corporate Policies & Procedures

17    3).  Brophy and Armstead were aware of this policy. (Brophy Dep., ECF No. 26-6, at 12–14;

18    Armstead Dep., ECF No. 27-6, at 20–22).  Further, DZHC responded promptly when notified of

19    a problem.  For example, when Brophy formally complained to Captain Lightfoot about

20    Homestead's inappropriate conduct, Lightfoot told Chief Matthias, who indicated he would

21    speak to Homestead about it. (Brophy Dep., ECF No. 26-6, at 67).  Brophy did not report the

22    problem to anyone else. (*Id.* at 67–68).  Nancy Rutherford of the human resources department

23    attests that Brophy made only one complaint to her department regarding Homestead or the fire

24    department. (Rutherford Aff. 3, undated, ECF No. 26-8).  That complaint was handled

25    immediately and to Brophy's satisfaction; subsequent follow-ups by Rutherford indicated

1    Brophy was satisfied. (*Id.*)  Moreover, in April 2008, Genia Williams conducted a two week

2    investigation after an anonymous tip to the ethics hotline, with the result that Homestead was

3    disciplined, Chief Matthias was reprimanded, and additional department training was

4    recommended. (Williams Dep., Oct. 13, 2010, ECF No. 26-26, at 18–21).

5         As to the second element, DZHC argues that although Brophy contacted her immediate

6    supervisors, she contacted Rutherford only once and she never used the company hotline.

7    (Brophy Dep., ECF No. 26-6, at 13–14).  In opposition, Brophy argues Rutherford lied about the

8    complaint Rutherford heard from her husband, Tim Rutherford, who also worked at the

9    department.  Brophy also argues that the anonymous hotline is simply another means to notify

10   the employer of harassment complaints, and since Brophy had already availed herself of the

11   policy by contacting her supervisor and human resources, there was no need to use the

12   anonymous hotline. (*Id.*).  In reply, DZHC argues that it handled Brophy's one formal complaint

13   to her satisfaction, and Brophy did not avail herself of available procedures further by contacting

14   human resources or the anonymous hotline, choosing instead to file a complaint in this Court.

15   The Court concludes that there is a material question of fact as to the Ellerth-Faragher defense,

16   and it should be put to the jury.

17        **2.    Pregnancy Discrimination**

18        Brophy and Armstead allege pregnancy discrimination.  Under Title VII, discrimination

19   "because of sex" or "on the basis of sex" includes discrimination because of or on the basis of

20   pregnancy, childbirth, or related medical conditions. *See* 42 U.S.C. § 2000e(k) (2006).  Title VII

21   does not entitle pregnant employees to be treated the same as employees with occupational

22   injuries, but only the same as other employees who are injured off duty. *See Urbano v. Cont'l*

23   *Airlines, Inc.*, 138 F.3d 204, 208 (3d Cir. 1998).

24        On November 6, 2007, Brophy received a doctor's note placing her on light duty for one

25   week. (Brophy Dep., ECF No. 26-6, at 49–50; Dr. Reimer Note, Nov. 6, 2007, ECF No. 26-15).

She presented the note to Richard Schumann at his home and told him it was because she was pregnant with twins. (Brophy Dep., ECF No. 26-6, at 49–50).  According to Nancy Rutherford, no light duty was available when Brophy reported her pregnancy, so DZHC was not able to accommodate her. (Rutherfeld Aff. 4).  The following day, Dr. Reimer gave Brophy a second note stating she could return to work on Friday, November 9, 2007 with no restrictions. (Dr. Reimer Note, Nov. 7, 2007, ECF No. 26-16).  Brophy missed two shifts (on November 6 and November 8) and used sick leave to avoid losing pay. (Brophy Dep., ECF No. 26-6, at 52–54).

Armstead discovered she was pregnant in August 2007. (Armstead Dep., ECF No. 27-6, at 33).  She obtained a doctor's note on September 13, 2007 placing her on light duty without exposure to actual firefighting and additional restrictions regarding climbing ladders, crawling, and lifting. (Dr. Donald Note, Sept. 13, 2007, ECF No. 27-14).  DZHC initially accommodated Armstead with light duty work when she reported her pregnancy. (Rutherfeld Aff. 3).  However, when no light duty was available as of February 14, 2008, DZHC placed her on medical leave. (*Id.*).

DZHC claims they treat pregnant women the same as employees who are injured off the job insofar as accommodations are concerned. (*Id.*).  When restrictions are reported to the base clinic, DZHC offers light duty work consistent with the restrictions, if available; otherwise the employee must wait until the restrictions are lifted. (*Id.*).  In their depositions, Brophy and Armstead testified that at least three male firefighters were accommodated after sustaining off-duty injuries. (Brophy Dep., ECF No. 33-1, at 25–27; Armstead Dep., ECF No. 32-2, at 7–8).  DZHC admits that one of these firefighters, Robert Sasser, was accommodated with light duty work for an off-duty injury in December of 1997.  However, when Plaintiff Lightfoot sprained his back prior to 2003, DZHC did not accommodate him and he stayed home until his restrictions were lifted. (Lightfoot Dep., ECF No. 27-9, at 3, 15–16).  Similarly, firefighters James Nelson and Thomas Ames were placed on restriction.  DZHC claims it was unable to

accommodate Nelson or Ames with light duty work.

The parties have established that pregnant employees are sometimes accommodated and are sometimes not, as is the case with all employees who are injured off-duty. There remains a question of fact whether Brophy and Armstead were treated differently with respect to light-duty accommodations versus employees who have been injured off the job. Trial is required to sort out the dispute over the availability of light duty during Brophy's and Armstead's pregnancies. Summary judgment is therefore inappropriate with respect to the pregnancy discrimination claims and is denied.

### 3. Retaliation

All three Plaintiffs bring claims of retaliation under Title VII. As discussed above, Lightfoot has not exhausted his administrative remedies with respect to retaliation, but the Court will address the merits for the record.

### a. Lightfoot's Time-Barred Charges

DZHC argues that Lightfoot's claimed acts of retaliation against him are time barred under Title VII. A charge under Title VII must be filed within 180 days after the occurrence of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1) (2006). However, where an aggrieved person has initially instituted proceedings with a state or local agency with authority to grant relief for such action, the charge must be brought within 300 days of the occurrence or within 30 days after receiving notification that the state or local agency has terminated its proceedings, whichever occurs earlier. *Id.* NERC is such a body in the state of Nevada. *See* Nev. Rev. Stat. § 233.150 *et seq.*

In the first incident, Lightfoot was suspended without pay for two weeks for, *inter alia*, failing to provide supervision and direction to his employees resulting in  an incident where employees constructed paddles on which racial slurs were written in magic marker. (*See* Lightfoot Dep., ECF No. 28-5, at 24–27). This incident occurred on or about March 21, 2006.

In the second incident, Lightfoot claims he was "denied a promotion [to assistant chief] due to his actions, despite having a good work history and positive performance reviews." (Lightfoot's Verified Answers to Interrog. 6; Lightfoot Dep., ECF No. 28-5, at 57). Lightfoot filed his claim with NERC on or about June 10, 2008, (Lightfoot COD), more than two years after the first incident and nearly eighteenth months after the second incident. As such, both of these charges are time-barred under Title VII, and the Court would grant summary judgment against Lightfoot's retaliation claim insofar as it rests on these allegations even if the Court had jurisdiction to rule on them.

### b.   Remaining Retaliation Charges

In order to establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that (1) he engaged in an activity protected under Title VII; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *Thomas v. City of Beaverton*, 379 F.3d 802, 811 (9th Cir. 2004). With respect to the first element, an employee has engaged in a protected act if he (1) has opposed any practice made an unlawful employment practice by this subchapter; or (2) has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing. 42 U.S.C. § 2000e-3(a) (2006); *see also Thomas*, 379 F.3d at 811. All three Plaintiffs filed charges with NERC requesting simultaneous filing with the EEOC. As such, Plaintiffs have engaged in protected activity.

### i.   Shannon Brophy

Brophy alleges multiple retaliatory acts resulting from her complaints of discrimination: (1) Douglas Homestead lied about Brophy's use of racial slurs in order to get her fired; (2) Nancy Rutherford told Brophy that if Brophy complained that DZHC was accommodating Armstead with light duty work, Armstead would be taken off work; (3) Brophy was denied training she required to be promoted; (4) Homestead denied Brophy the right to drive and

1  operate certain equipment because her breasts were too big; (5) Brophy was not considered for

2  firefighter of the quarter; and (6) DZHC refused to enforce the company's anti-violence policy

3  against Jeff Moosman who made threats against Brophy and Lightfoot. (Brophy's Verified

4  Answers to Interrog. 6).  Any of these, if true, would constitute an adverse employment action.

5  Brophy resigned from DZHC on March 17, 2008, (Brophy Dep., ECF No. 32-1, at 4), and she

6  filed a charge of discrimination with NERC on or about March 31, 2008 claiming she was

7  constructively terminated, (*see* Brophy COD).

8       Brophy admits, however, that Homestead did not tell any lies about her. (Brophy Dep.,

9  ECF No. 33-2, at 20–22).  She does assert in her response that Homestead lied about Brophy's

10  use of racial slurs in his letter of April 27, 2009.  However, that letter was written after Brophy

11  resigned on March 17, 2008 and so could not have resulted in her termination. (See Brophy

12  Dep., ECF No. 33-2, at 22).  Brophy did make an issue about Armstead's light duty

13  accommodation and Armstead was subsequently taken off work. (*Id.*, ECF No. 26-6, at 95–96).

14  However, Brophy herself suffered no adverse employment action as a result.  Brophy admits that

15  the only training she was denied was for "props and confined spaces," but that it was due to her

16  weight. (*Id.* 38–40).  Brophy admits that although she was denied the right to drive the fire

17  apparatus (with the stated reason that her breasts were too large), she eventually was allowed to

18  drive the fire apparatus and received no dock in pay as a result. (*Id.* 97–99).  Although Brophy

19  has not received the firefighter of the quarter award and claims she was not considered for it, she

20  was nominated for the award and admits she does not know why she did not receive it. (*Id.*

21  99–100).

22       Brophy's final claim is one that she did not raise in her initial answer to interrogatories

23  regarding "each act of retaliation" she contends was made against her. (Brophy's Verified

24  Answers to Interrog. 6).  DZHC argues that the Court should therefore not consider this claim.

25  The claim involves an allegedly threatening text sent by Jeff Moosman (Brophy's ex-husband) to

1    Brophy on August 7, 2007 stating "Lightfoot better be careful.  I was hoping for a fire when I

2    worked with him.  I will leave his ass in there in a fire.  He is too fat to carry, and with two

3    broken legs he would not be able to make it out alive.  I would leave him." (Brophy Dep., ECF

4    No. 26-6, at 103–04).  Other than a minor incident between Brophy and Moosman at the gym,

5    this appears to be the only incident involving Moosman. (*Id.* at 106–07).  It appears that Nancy

6    Rutherford then established a policy whereby Brophy and Moosman would not work on the

7    same shift. (*See id.* at 107).  However, a situation arose in March 2008 where Moosman and

8    Brophy were assigned to the same overtime shift. (*Id.* at 107–09).  Brophy expressed her

9    concerns and then resigned claiming that she was in fear of her safety. (*Id.* at 110–12).  However,

10   nowhere in her deposition, nor through other evidence, does Brophy show that this was an act of

11   retaliation or establish any nexus between her EEOC claims and the Moosman incident.  And

12   there is no evidence Moosman ever threatened her directly, but only Lightfoot indirectly.

13   Brophy has failed to establish that any of the alleged acts of retaliation against her resulted in an

14   adverse employment act and were related to a protected act.  Her potential constructive discharge

15   was based on a gender-based hostile work environment.  The Court will grant summary

16   judgment against her retaliation claims.

17        **ii.    Khristina Armstead**

18        Armstead alleges that her pregnancy accommodation was taken from her once she

19   complained of the treatment she received based on race and gender, and that DZHC offered no

20   non-retaliatory reason for removing the accommodation.  Brophy alleges that Armstead was

21   taken off light duty subsequent to Brophy's own complaints. (*Id.* 95–96).  There remains a

22   question of fact whether the termination of Armstead's accommodation was in retaliation for

23   Brophy's actions or whether there truly was no light duty work available.  Retaliation against

24   Armstead based on Brophy's protected conduct, however, does not support Armstead's own

25   retaliation claim.  But Armstead's claim that her accommodation was taken because of her

1   complaints of harassment indicates actionable retaliation.  The Court will not grant summary

2   judgment against Armstead's retaliation claim.

3          **iii.     Michael Lightfoot**

4          Excluding the time-barred incidents, Lightfoot alleges he was: (1) wrongfully accused of

5   falsifying documents for the inspection of the department's ambulances; (2) put under great

6   stress by having to work with Jeff Moosman (after Moosman's threatening text message); (3)

7   and moved to different crews outside the normal rotation.  Lightfoot alleges that two firefighters

8   accused him of falsifying documents so the department's ambulances would pass inspections.

9   (Lightfoot Dep., ECF No. 34-6, at 2–3; *id.*, ECF No. 34-5, at 26).  However, he admits that no

10  adverse employment action resulted. (*Id.*, ECF No. 34-6, at 2).  As discussed above, Jeff

11  Moosman allegedly sent a threatening text message to Brophy regarding Lightfoot.  Lightfoot

12  states that his effectiveness was impacted because he had to figure out a way to avoid Moosman

13  and still get his job done. (*Id.* at 15).  However, he admits that his supervisors did not tell him

14  that his job performance was affected. (*Id.*).  He thus fails to demonstrate a nexus between this

15  incident and any adverse employment action.

16         Finally, Lightfoot declares that while crew shifts do occur from time to time, he and one

17  other individual were swapped in a manner that had never happened before in his experience.

18  (*Id.* at 17–18).  However, he admits that he was still a captain and was not docked any pay. (*Id.*

19  at 18–19).  Lightfoot has failed to establish that any of the alleged acts of retaliation resulted in

20  an adverse employment action.  The Court would therefore grant summary judgment against his

21  retaliation claims even if it had jurisdiction over them.

22         **4.     Negligent Supervision and Training**

23         In addition to their Title VII claims, Plaintiffs bring a state law claim for negligent

24  supervision and training.  DZHC first argues that this claim should be dismissed if the federal

25  claims are dismissed because such claims are better left to state court.  As discussed, the Court

1    will not dismiss all of the federal claims, so there is supplemental jurisdiction.

2        DZHC next argues that a claim for negligent supervision does not lie in Nevada in the

3    absence of physical harm. *See Hall v. Raley's*, No. 3:08-cv-00632-RCJ-VPC, 2010 WL 55332

4    (D. Nev. Jan. 6, 2010) (Jones, J.).   In the relevant passage, this Court addressed the defendant's

5    argument that physical harm was required by noting that "[s]ome jurisdictions have limited

6    claims for negligent hiring, retention, and supervision to situations involving the threat of

7    physical injury," and predicting "that physical harm is necessary for a negligent retention and

8    supervision claim in Nevada." *Id.* at *9.   Another judge of this District analyzed various cases

9    involving negligent supervision and training both in Nevada and other states and certified the

10   following question to the Nevada Supreme Court: "Does a claim for Negligent Training and

11   Supervision in Nevada require that the plaintiff suffer physical harm as a result of the employer's

12   negligence in training or supervising the employee that terminated the plaintiff?" *See Robertson*

13   *v. Wynn Las Vegas*, No. 2:10-cv-00303-GMN-LRL, 2010 U.S. Dist LEXIS 81670, at *9–15 (D.

14   Nev. Aug. 9, 2010) (Navarro, J.).   At oral argument, counsel represented that the Nevada

15   Supreme Court case was to be dismissed.   The Court therefore will rule as it did in *Raley's* and

16   dismiss the negligent training and supervision claim for failure to state a claim.

## CONCLUSION

17

18       IT IS HEREBY ORDERED that the Motion for Summary Judgment as to Plaintiff

19   Shannon Brophy (ECF No. 26) is GRANTED in part and DENIED in part.   Her claims for

20   gender-based hostile work environment and pregnancy discrimination may proceed.

21       IT IS FURTHER ORDERED that the Motion for Summary Judgment as to Plaintiff

22   Khristina Armstead (ECF No. 27) is GRANTED in part and DENIED in part.   Her claims for

23   race-based hostile work environment, pregnancy discrimination, and retaliation may proceed.

24       IT IS FURTHER ORDERED that the Motion for Summary Judgment as to Plaintiff

25   Michael Lightfoot (ECF No. 28) is GRANTED.

1      IT IS FURTHER ORDERED that the Motion for Leave to File Excess Pages (ECF No.

2 37) is GRANTED.

3      IT IS SO ORDERED.

4     DATED:  This 5th day of July, 2011.

5                            _____

6                              ROBERT C. JONES
                             United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25